Filed 4/12/22 In re C.M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re C.M., a Person Coming Under the Juvenile Court Law. | B312781 (Los Angeles County Super. Ct. No. 21LJJP00205A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> C.W., <br><br> Defendant and Appellant. | |

APPEAL from findings and an order of the Superior Court of Los Angeles County. Marguerite D. Downing, Judge. Affirmed in part and dismissed in part.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

C.W. (mother) appeals from the juvenile court's order assuming jurisdiction over her son, C.M. (born Aug. 2015) and removing him from her care. (Welf. & Inst. Code, §§ 300, 361.)[1] She contends that (1) the jurisdictional findings are not supported by substantial evidence; and (2) the juvenile court's removal order is not supported by substantial evidence.

Because the juvenile court's jurisdictional findings are supported by substantial evidence, we affirm. In light of C.M.'s return to mother's custody, her challenge to the juvenile court's removal order is moot.

**FACTUAL AND PROCEDURAL BACKGROUND**

*The Family*

In addition to C.M., at all relevant times, mother was caring for her siblings M.B. (born Apr. 2010), Ky.B. (born Aug. 2005), and Ka.B. (born July 2006). Ky.B. and Ka.B. are mother's full siblings. Mother and M.B. share the same father; M.B.'s

_____

[1]　All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

mother is Antoinette R. (Antoinette).  The siblings had been placed in her care by the juvenile court after their father died.[2]

*Detention Report (Apr. 16, 2021)*

On April 10, 2021, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging general neglect arising from an incident between mother and Antoinette.  A DCFS social worker responded at the sheriff's department station.  At the station, a deputy reported that mother was under the influence of alcohol.

Interview with mother

Mother reported that she had been caring for M.B. and her full siblings since March 2021.  As to the incidents that led to her arrest, she explained that she had gone to a park to meet with friends.  She left the children in the care of her biological adult sister, Taijaye S. (Taijaye), who had moved into the home to assist her with caring for the children.  Mother stated that at the park, she consumed approximately one cup of champagne at 5:00 p.m.

While at the park, mother received text messages and telephone calls from M.B.'s mother, Antoinette, regarding mother confiscating M.B.'s telephone.  Antoinette was quite irate that mother had confiscated the phone because Antoinette had purchased it for M.B.

Mother said that a friend returned her to her home.  When she arrived home, she sat in her own vehicle in the driveway.  Antoinette was there.  Mother attempted to explain to Antoinette when she had confiscated M.B.'s phone and said that she had

---

[2]     The appellate record is silent as to why mother's three siblings were detained and not released to their mothers.

3

done so because M.B. had allowed Ky.B. to utilize his hotspot so that Ky.B. could stream videos.  Mother contacted 911 for assistance.

As mother sat in her car, Antoinette began to pound on the car's window demanding the phone.  Then Antoinette sprayed mother with pepper spray, entered the vehicle, and began punching her.  Mother put the car in reverse, but Antoinette was not completely in the vehicle when it began to move.  In addition, M.B. had entered the vehicle and was laying on top of Antoinette, punching mother's face as Antoinette was also hitting her.  Mother reported that she drove her vehicle after being punched by M.B., causing her to blackout.  She stopped the car approximately half a block away and both M.B. and Antoinette walked back to the home.

Interview of Ky.B.

Ky.B. said that he had never seen mother smoke marijuana, but sometimes she smelled of marijuana.  He also said that he had never seen her drink, and that mother does not drink or smoke at the house.

Ky.B. reported that when the incident took place, he and Ka.B. were very scared because it escalated quickly.  He remembered Antoinette unlocking the car door and pepper spraying mother.  Then Antoinette jumped into the car and began punching mother.  Mother backed out of the driveway.  M.B. jumped into the car and onto Antoinette and both began punching mother, who drove approximately half a block away from home with both M.B.'s and Antoinette's legs dangling from the car.

4

<u>Interview with Ka.B.</u>

Ka.B. reported that she had never seen mother drinking or smoking marijuana, and never saw mother under the influence. She said that her adult sisters are strict and that she does not like that.

Ka.B. reported that at approximately 7:00 p.m., Antoinette began attacking mother's driver's side window and pepper sprayed mother. Antoinette then went to the passenger side of the car, opened the car door, and jumped into the car, leaving her legs outside the car while she was punching mother. Mother tried to back up and drive away with Antoinette hanging out of the vehicle, and stopped in the middle of the street.

<u>Interview with M.B.</u>

M.B. reported that he called Antoinette from his neighbor's house because he was angry with mother for taking his phone away. He said, "'No, [mother] doesn't hit us. I don't know about her using drugs. She took my phone away; she didn't pay for it. I punched her in the face; I don't know why I did what I did, but she needed to give back the phone.'"

<u>Mother's arrest</u>

Mother was arrested.

<u>Detention</u>

C.M. was detained from mother on April 11, 2021.

*Section 300 Petition; Arraignment & Detention Hearing*

DCFS filed a petition pursuant to section 300, subdivisions (a) and (b), alleging that C.M. needed the protection of the juvenile court.

The juvenile court held an arraignment and detention hearing on April 16, 2021. Mother requested that C.M. be released to her care. The juvenile court denied her request,

5

finding that C.M. was described by section 300 and that there was a substantial danger to the child and no reasonable means to protect him without removal from mother's physical custody.

*Jurisdiction/Disposition Report (May 27, 2021)*

By the time the social worker interviewed the people involved in the April incident, some details had changed.

<u>Interview with Antoinette</u>

Antoinette, who had not been interviewed by DCFS at the time of the incident, denied that she had used pepper spray on mother. She reported that on that day, she had been trying to get a hold of M.B. on his cell phone but she could not reach him. M.B.'s neighbor told her that mother had taken his cell phone away from him.

Antoinette stated that she called mother, and that they agreed that Antoinette would take the phone back. Because Antoinette arrived at the house before mother, Antoinette called her. Antoinette stated: "'I could tell [mother] had been drinking, but I didn't think it would escalate like it did.'" Eventually, mother drove up to the house in her truck. Mother remained in her car and was on the phone. When Antoinette approached the passenger side of the truck and repeatedly asked for the cell phone, mother refused to give it to her.

At some point, mother unlocked the door, so Antoinette opened the passenger side door and stepped up on the lower back step of the truck in an attempt to sit in the truck. However, mother then put the car in reverse, which caused the door to hit Antoinette. She stated, "'I still have a lump on my leg from when the door hit me.'" Thereafter, M.B. came and began to hit mother. Mother then drove down the street while M.B. and

Antoinette were partially hanging out of the car. Antoinette managed to put the car in park and bring the vehicle to a stop.

Antoinette reported she could smell alcohol on mother. Mother was also slurring her words.

Interview with Ky.B.

Ky.B. told the social worker that his little brother M.B. had called Antoinette and told her that mother had taken away his phone. Later that day, Antoinette came to the home and asked mother where the child's phone was. Mother was sitting in her car and Antoinette put her hand in the window and unlocked the car. He added that mother almost ran over Antoinette's feet. M.B. and Antoinette jumped in mother's car, and mother drove down the street.

Interview with Taijaye

Taijaye was present during the incident. According to Taijaye, the children were upset that their cell phones were taken and M.B. told Antoinette that mother had taken his phone. Antoinette came to the home to get M.B.'s phone back and used pepper spray on mother. Taijaye tried to help mother by bringing out milk to pour on her eyes. Taijaye denied that M.B. and Antoinette were hanging out of the car or that mother was under the influence of any substances.

Sheriff's Department Report

According the Los Angeles County Sherriff's Department's report, the responding deputy came across mother stumbling into an intersection while talking on the phone. She was swaying side to side and appeared agitated. She had a small cut on her nose as if a small piece of jewelry was removed and her clothing was stained and wet from an unknown liquid. Her eyes were unable to focus while speaking with the deputy, who reported smelling

alcohol emitting from her breath. The deputy also noted an obvious slurring of speech.

Mother told the deputy that she was the caretaker of her young siblings and had a child of her own. All five of them lived in the home of their deceased father. Earlier this week, she had taken the children's cellphones away from them as discipline for poor grades. That day, M.B.'s mother, Antoinette, showed up to the house and demanded her son's phone back from mother.

Mother said that she was driving her car in front of her house when Antoinette reached into her vehicle, opened the door, and began, "'putting her hands on [me].'" The children were not in the car at the time. According to the deputy, mother was unable to provide details about how she was struck by Antoinette, nor was she able to follow direct commands to remain in one specific area or be seated for her safety.

The deputy noted that mother consistently changed her explanation of what "'Putting hands on me,'" meant. It began as an alleged battery taking place through the window with no witnesses and later was described as an assault using pepper spray with several witnesses. Initially, mother said no one was outside, and later stated several people were outside.

The deputy also spoke to the neighbor, Lico. She said that she was a previous guardian of the children. She reported that she had had several issues with the children's biological parents and guardians over the years. Lico said that "'Nobody reached into [mother's] car.'" She saw mother call Antoinette over to her car and start to drive away as Antoinette was leaning into the car. She also saw M.B. get in the vehicle, and then mother drove off as M.B. and Antoinette were hanging out of the car. She said that mother was drunk.

8

The deputy also talked to Ka.B., who said that her siblings were standing outside the residence when mother pulled up to the house driving an SUV. Antoinette asked mother to give her M.B.'s phone, but mother refused.

Antoinette then opened the passenger door to talk with mother and mother began driving forward. Antoinette jumped up into the car in order to not be trapped between the curb and the car, and mother stopped just long enough for M.B. to open the door and yell for mother to stop driving. Mother slammed on the gas pedal and drove, "'[a]s fast as she could,'" forcing M.B. to cling to the vehicle to avoid getting run over or run into the curb.

Ka.B. told the deputy that mother had been drinking at a friend's house prior to the incident and had previously driven the children while under the influence of marijuana or alcohol. She said that mother had become very authoritative and increasingly physical with her discipline.

M.B. told the deputy that he went over to the car to defend his mother (Antoinette) from being hit by mother. He said that mother started driving and "'I almost fell out of the car. She was driving so fast.'" When the deputy informed M.B. that he would be removed from mother's care, M.B. took a big breath and sighed, "'Thank you!'"

The deputy contacted Antoinette, who said that she was called over to the car by mother who, unprovoked, reached over to the passenger side and started assaulting her. Mother was grabbing her bandana and pulled her into the car. She denied owning or possessing pepper spray and did not use any against mother.

According to the Sheriff's Department report, mother submitted to a blood alcohol test, which yielded a 0.092 percent

9

blood alcohol content (BAC) at 10:55 p.m., and a 0.093 percent BAC at 10:57 p.m. Additionally, a chemical breath test yielded 0.08 percent BAC at 9:05 p.m. and 0.09 percent BAC at 9:08 p.m.

DCFS Recommendation

DCFS recommended that C.M. be declared a dependent of the juvenile court, and mother be offered reunification services.

*Adjudication (May 27, 2021)*

At the adjudication hearing on May 27, 2021, the detention report and jurisdiction/disposition report were admitted into evidence. Mother moved into evidence a progress report from Tarzana Treatment Center, sign in sheets showing attendance at AA meetings, and a letter showing progress in a parenting program. No other evidence was introduced.

After entertaining oral argument, the juvenile court found the allegations set forth in the section 300 petition to be true.[3] It

---

[3]    As sustained, counts a-1 and b-1 of the petition read: Mother "has a history of violent and assaultive behavior. On 04/10/2021, in the presence of [C.M.], the mother engaged in a physical altercation with [Antoinette]. [Antoinette] pepper sprayed the mother, and repeatedly struck the mother. Further, [M.B.] entered the mother's vehicle and repeatedly struck the mother. The mother drove the . . . vehicle while [Antoinette's and M.B.'s] legs were hanging out of the vehicle window. Such violent and assaultive behavior on the part of the mother endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."

Count b-2 reads: Mother "placed [M.B.] in a detrimental and endangering situation in that the mother drove a vehicle while [his] legs were hanging out the vehicle window. On 04/10/2021 the mother [was] arrested for PC 273A(A) - Child Cruelty: Possible Injury/Death. Such conduct by the mother,

10

removed C.M. from mother's custody.  In addition, it granted mother reunification services, including random drug tests, individual counseling to address case issues, and parenting classes.  Mother was also to comply with all conditions of probation or her criminal case.

*Notice of Appeal*

Mother's timely appeal ensued.

---

endangers the child's physical health and safety, and places the child at risk of serious physical harm, damage, and danger."

## DISCUSSION

I. *Standard of review*

As the parties agree, we review the juvenile court's jurisdictional findings for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574, overruled in part by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re A.S.* (2011) 202 Cal.App.4th 237, 244, overruled in part by *Conservatorship of O.B., supra,* at p. 1010, fn. 7.) Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446, overruled in part by *Conservatorship of O.B., supra,* at p. 1010, fn. 7; *Conservatorship of O.B., supra,* at p. 1010, fn. 7; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.) "[W]e view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

As the appellant, mother must establish that the findings that she challenges are not supported by substantial evidence. (See *In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

II. *Jurisdiction*

A. <u>Relevant law</u>

Section 300, subdivision (a), authorizes dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . . For purposes of this subdivision, a court may find

there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) "Nonaccidental" generally means a parent or guardian "acted intentionally or willfully." (*In re R.T.* (2017) 3 Cal.5th 622, 629.)

Section 300, subdivision (b)(1), authorizes dependency jurisdiction over a child where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of [his or her parent] . . . to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Three elements are often cited as necessary for a jurisdictional finding under section 300, subdivision (b)(1): "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820; see also *In re L.W.* (2019) 32 Cal.App.5th 840, 848; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; *In re Ma.V.* (2021) 64 Cal.App.5th 11, 21–22.)

The first prong "requires no more than a parent's 'failure or inability . . . to adequately supervise or protect the child.'" (*In re R.T.*, *supra*, 3 Cal.5th at p. 629.) It does not require parental culpability. (*Ibid.*)

Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re J.N.* (2021) 62 Cal.App.5th 767, 775), the juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.

13

(*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383.) "[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

B. <u>Analysis</u>

Ample evidence supports the juvenile court's jurisdictional findings under subdivisions (a) and (b). Specifically, there was evidence that mother was under the influence of alcohol, and while under the influence, allowed a volatile situation to escalate and drove with one of the children in her charge (M.B.) hanging out of her car, placing the child's life in danger. And, there was evidence that this was not a onetime event; Ka.B. told the deputy that mother had previously driven the children while under the influence of marijuana or alcohol.

Admittedly, there seem to be various versions of the events that led to mother's arrest in April 2021. While mother contends that she was the innocent victim of a brutal assault and was faultless in the incident, the witness statements and the sheriff's department report tell a different story. For example, although mother alleged that Antoinette approached her and used pepper spray on her, Antoinette denied using pepper spray. Furthermore, Antoinette stated that mother unlocked her car door, so she opened the passenger side door and stepped up on the lower back step of the truck in an attempt to sit in the truck. However, mother then put the car in reverse, which caused the

14

door to hit Antoinette.  Antoinette also told law enforcement that she was called over to the vehicle by mother who, unprovoked, reached over to the passenger side and started assaulting her by grabbing her bandana and pulling her into the car.

Mother claims that Antoinette began to hit her, but law enforcement reported that mother was unable to provide details about how she was struck by Antoinette.  And, Antoinette stated that mother drove down the street while M.B. and Antoinette were partially hanging out of the car.

Regarding her alcohol use prior to the incident, mother reported that she had only consumed approximately one cup of champagne at 5:00 p.m.  However, when the deputy met mother, he reported that "[s]he was swaying side to side and appeared agitated.  She had a small cut on her nose as if a small piece of jewelry was removed and her clothing was stained and wet from an unknown liquid."  Mother's eyes were unable to focus, she was slurring her words, and the deputy smelled the odor of an alcoholic beverage emitting from her breath.[4]  After Mother was arrested, she consented to a blood alcohol test, which yielded a BAC of over 0.09 percent.

The juvenile court was not required to give credence to mother's narrative, and we cannot, and will not, reweigh the evidence, second-guess credibility determinations made by the juvenile court, or resolve conflicts in the evidence.  (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161–1162; *In re Lana S.* (2012) 207 Cal.App.4th 94, 103.)

---

[4]     Antoinette also reported that she could smell alcohol on mother and that mother was slurring her words.

The fact that C.M. was not in the immediate vicinity of the altercation and did not observe it occur is irrelevant. The incident that occurred demonstrates that mother is unable to control her anger. She allowed a dangerous encounter to escalate quickly, making Ky.B. and Ka.B. frightened. And, Ka.B. informed the sheriff's deputy that mother had become very authoritative and increasingly physical with her discipline. Taken together, this evidence supports the juvenile court's finding that C.M. was at a substantial risk of harm.

*In re J.N.* (2010) 181 Cal.App.4th 1010 does not compel a different result. In some respects, *In re J.N.* is similar to the instant case. For example, the dependency petition in that case was filed against the parents following a single incident of driving while intoxicated with their children in the car. (*Id.* at p. 1014.) However, *In re J.N.* is also distinguishable. In that case, the parents repeatedly and consistently expressed remorse for their conduct and relief that their children were safe. (*Id.* at pp. 1017–1019.) In addition, a social worker submitted a report to the juvenile court on the mother's behalf recommending that the case be closed. (*Id.* at p. 1020.) And, the juvenile court noted that the mother was already on formal probation supervision stemming from her criminal case, which probation included court orders that the mother complete substance abuse and parenting programs. (*Id.* at p. 1019.) Moreover, prior to adjudication, the children were returned to their mother's care and were reported to be doing well. (*Id.* at p. 1020.)

In contrast, here, there is no evidence of mother's regret and remorse as to what occurred during the dangerous incident that led to these dependency proceedings. Instead, mother continues to blame Antoinette and claim that she was just the

16

innocent victim of a random, violent attack.  And, mother was not otherwise subject to formal supervision at the time the dependency court took jurisdiction and C.M. has not been returned to her care.  Thus, *In re J.N.* is not persuasive.

III.  *Disposition*

On our own motion (Evid. Code, §§ 452, 459), we take judicial notice of the juvenile court's November 29, 2021, minute order returning C.M. home to mother and terminating suitable placement.  That renders this portion of the appeal moot.  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.)

## DISPOSITION

The juvenile court's jurisdictional findings are affirmed. Mother's challenge to the juvenile court's disposition order is dismissed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT